61   299
174   320

## SOLOMON F. FLINT

### *v.*

## WILLIAM LEWIS.

1. TRUST ABUSED—*jurisdiction in equity.* Where there is a conspiracy by the holder of a note secured by trust deed, to take advantage of the maker of the deed, and, by an abuse of the trust, wrongfully to deprive him of his equity of redemption, the right of the latter to relief rests upon the clear and solid ground of equitable jurisdiction over trusts, for the control of all fraudulent abuses of them, unless barred by the paramount claims of a *bona fide* purchaser for valuable consideration, and without notice.

2. NOTICE TO PURCHASER—*what constitutes.* Where a person is, and for thirty years has been, in the open and visible possession of a tract of land as his farm and residence, that possession is notice to all the world that he has some interest in the land; and whoever buys it while that possession continues, takes it subject to that interest, whatever it may be.

3. SAME—*deed as notice.* And in such a case, where one half the land lay within four miles of a thriving and populous city, and the other half much nearer, and was sold under a trust deed at the rate of $100 for each forty acres, which facts were recited in the deed made by the trustee, a second purchaser who buys the land a few days later, taking a quit-claim deed in which the expressed consideration is $1000, is chargeable with notice of all the facts recited in or shown by the deed from the trustee.

4. SAME—*inadequacy of price.* And in such a case, where the last purchaser claims to have bought in good faith without notice, and yet lived at the time within four miles of the land, which was then worth $50 an acre, his claim must be denied, since it is wholly unnatural to suppose that he made the purchase without knowing where the farm was situated, its general character and value; and the fact that a farm worth $4000 had been lately sacrificed for $200, would suggest to any man of ordinary judgment that there was some mistake, or some overreaching, in the transaction sufficient to put him upon inquiry, and his failure to make such an inquiry is equivalent to notice.

APPEAL from the Circuit Court of Knox county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. WILLIAMS, CLARK & CALKINS, and Messrs. FROST & TUNNICLIFF, for the appellant.

Messrs. CRAIG & HARVEY, and Mr. S. C. LANPHERE, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

On the 23d day of May, 1863, the appellee, William Lewis, being indebted to a firm doing business in the city of Galesburg, in this State, under the name of C. S. Colton & Sons, in the sum of $874.08, executed to said firm his four promissory notes of that date, for the sum of $218.52 each, and payable respectively in one, two, three and four years from date, with interest at the rate of ten per cent per annum, payable annually. As security for the payment of these notes, he, at the same time, executed a trust deed, for the benefit of the payees, to one Milo D. Cooke, as trustee, the deed covering two forty-acre tracts of land situate in Knox county, near said city, and properly described in the deed, which declared the trust and contained the power that, in case of default in the payment of the notes, either, or any part of them, then, on the application of any legal holder, it should be lawful for said trustee to sell and dispose of said premises and all right, benefit and equity of redemption of the grantor therein, at public auction, at the

south door of the court house of said county, for *the highest and best price the same will bring in cash,* ten days public notice having been previously given of the time of such sale, by advertisement in one of the newspapers at that time published in said county. It also authorizes the trustee to execute a deed to the purchaser.

Under this power, the trustee sold the land conveyed. It was purchased by one Stoddard, for $100 for each forty-acre tract, to whom the trustee executed a deed, and Stoddard quit-claimed to Flint.

Lewis filed his bill in the Knox county circuit court, alleging a fraudulent collusion between Stoddard and one of the Coltons, to cheat him out of said lands, and breach of duty on the part of the trustee, and asked to have the sale and deeds thereunder set aside, and to be allowed to redeem, alleging that Flint purchased with notice, etc.

Flint, Stoddard, the Coltons, and Cooke, the trustee, were made parties defendant, and filed their answers, to which replication was filed.

The cause was heard upon pleadings, proofs and exhibits, and a decree was rendered in favor of Lewis, setting aside the sale and deeds. The defendants appealed from that decree, to this court.

It appears that Lewis paid the first three notes, and all interest, not precisely when due, but in a manner satisfactory to the payees. When the last note came due, in May, 1867, it seems that Colton did not want the principal. The interest was paid, and by mutual consent the principal was to remain unpaid another year. About the time it would be due by that understanding, Lewis called on C. S. Colton and inquired of him if he wanted his money. The latter proposed to him to pay the interest and $18.52, so as to reduce the principal to just $200, and let that remain another year.

William Lewis was far advanced in life, and was blind. Relying probably on the previous dealings between him and C. S. Colton, with whom he had all the dealings, so far, when

May, 1869, came around, he did not go to see Colton until the 29th day, some three days after the balance was due, by their verbal understanding. He then asked C. S. Colton if he wanted his money. The latter replied that he needed the money. Lewis then said, as he testifies: "Give me the mortgage, and I will go to Stoddard and get the money." Colton then said: "Don't do it; don't you let this mortgage go into any stranger's hands; it is safe in our hands, and we can do very well without the money for another year." This, William Lewis testified, was the first time he had ever said he wanted the money, and witness supposing, in his blindness, that Colton was still present, replied: "I will have it in a few days." But before this remark was uttered, Colton had gone.

It is true that C. S. Colton, though rather evasively, denies having such conversation, at the time alleged, and his son, John B. Colton, who himself claims to have been present, denies it *in toto*. But the complainant, testifying to an affirmative fact, is corroborated by his son, who was with him, and there is an inherent probability in his favor arising from other circumstances.

John B. Colton testifies "that Wm. Lewis wanted to pay him money on the notes before they were due, and witness told him he would rather have the trust deed than the money. Afterwards, Lewis wanted witness to take the money to accommodate him. It was a portion of what was due on the trust deed, but not all."

So it was true, in fact, that they could get along another year very well without the money, and, indeed, it is very apparent, from the evidence, that until C. S. Colton parted with control over the note, and it was supposed that an opportunity had been presented to John B. Colton and Stoddard to overreach old Mr. Lewis, and wrongfully deprive him of his farm by means of the trust deed, the holders of the note were very willing to let the balance lie and take their interest, which had been promptly paid. Besides, old Mr. Lewis, before he gave

the deed, and ever afterwards, was extremely anxious lest some advantage would be taken of him, and he lose his farm. The Coltons, including John B., were perfectly aware of this, and had given him strong assurances that no such advantage would be taken of him. Acting under this fear, which was perhaps stimulated somewhat by the abrupt manner in which C. S. Colton had left him while talking about the balance, he proceeded at once to raise the money with which to pay it. He succeeded; and on the 10th of June, 1869, sent his son, Hiram, with it, to make the payment; but, strange to say, neither of these Coltons could be found, and he went back with the object unaccomplished. On the 20th of the same month, Hiram was sent again, and although using every reasonable degree of diligence, neither of them could be found. Then, on the 28th of the same month, a neighbor took the money, Hiram accompanying him, and they both went in search of some of the Coltons, for the purpose of paying this balance, but neither could be found, and the messengers were told that they had all gone East, which appears to have been untrue.

In the course of these efforts, Stoddard was made aware of Lewis' purpose to pay the balance.

But what were the Coltons doing, meanwhile?

After the conversation on the 29th of May, when C. S. Colton left so suddenly, C. S. and his other son transferred their interest in the note to John B. Colton. C. S. Colton at that time well knew that old Mr. Lewis had not come prepared to pay the balance, on account of the manner of their former dealings, and their expressed desire to let it lie and draw their interest; and they well knew, from his previously expressed anxiety in respect to the matter, that they could have the money in a very few days, by saying that they wanted it. But C. S. Colton, after giving an assurance which would have the tendency to allay the old man's fears, withdrew suddenly from the conference before hearing Lewis' reply, and it is highly probable, from the fact that they could not be found when the

messenger was in search of them to make the payments, and from the fact that Stoddard, who was acting in concert with them, knew of it, that they were all aware that old Mr. Lewis was ready and anxious to pay off the lien upon his home, where he had lived for upwards of thirty years and raised his family. But while Lewis was prepared and making earnest endeavors to pay the $200, which was all that remained unpaid, and his agents seeking the payees, to make the payment—while all the parties lived in Galesburg, except old Mr. Lewis, and he lived only four miles out—while there were three newspapers published in Galesburg—John B. Colton went to Knoxville, nine miles from Galesburg, five miles further away from Lewis than Galesburg, where he and his family did their trading and business, and on the 15th of June, 1869, prepared and caused to be published in a Knoxville paper, a notice of trustee's sale of the eighty acres covered by the trust deed, on the 28th of that month. The notice recited the trust deed, the notes, bearing date on the 23d of May, 1863, and stated that the note for $218.52, bearing that date, and due in four years from date, had been assigned to John B. Colton; that it was due and all unpaid; which John B. Colton knew at the time was false, for he knew that the interest had been paid, and the principal reduced to $200.

One tract of this land lies only half a mile from the city limits of Galesburg, and the other somewhat farther. Lewis was old and blind. There was no agreement in the deed expressly waiving personal notice, nor any expressly requiring it. If the payment of the amount due was what was wanted, they knew that personal notice to him of the sale would bring it. If, on the other hand, the notice had been published in a Galesburg paper, then it is more than likely some of the neighbors and friends of the old man or his son would have seen it, and the sale stopped.

This was evidently not a desirable result, on the part of the managers of the scheme.

Suffice it to say, that Lewis got no notice, and the very day his agents were seeking after the Coltons to pay the balance, the trustee sold the farm of eighty acres to Stoddard, he bidding the sum of $100 for each forty-acre tract, and under the power, the trustee executed to him a deed.

This land was proven to have been worth $50 per acre, making an aggregate of $4000.

But it turns out, according to the evidence, that John B. Colton and Stoddard had been acting in concert in the matter of the sale; that the former, not caring, under the circumstances, to take the fruits of his scheme to defraud this old blind man out of his farm directly into his own hands, had, between the time of advertising and the sale, made a transfer of his interest in the note to Stoddard, and the latter seems to have been troubled with a like uneasiness, and becomes suddenly seized with a desire to become rid of the title he had acquired. He concludes that he would like to be the proprietor of some real estate, as he says, in the city. Flint had some lots which he had been using for a cow pasture, which he traded with Stoddard for the Lewis farm; and on the 13th of July, 1869, Stoddard and wife executed to Flint a quitclaim deed of it. The consideration expressed was $1000.

We shall not stop to criticise the action of the trustee in permitting or making the sale under the circumstances. The right to relief rests upon the clear and solid ground of equitable jurisdiction over trusts, and to control all fraudulent abuses of them, unless barred by the paramount claims of a *bona fide* purchaser for valuable consideration, and without notice.

This sale was made under the power contained in the trust deed, in pursuance of a most clearly definable conspiracy between John B. Colton and Stoddard, to take undue advantage of Lewis, and, by an abuse of the trust, to wrongfully deprive him of his equity of redemption. It is one of those inequitable proceedings which a court of equity will readily undo,

20—61ST ILL.

unless prevented by the position occupied by Flint, which it is insisted is that of a *bona fide* purchaser without notice.

Unless the conveyance to Flint was a mere pretense to create the color of a *bona fide* purchase, it is wholly unnatural that he made the exchange without first knowing where the Lewis farm was situated, its general character and value.

The deed from the trustee to Stoddard recited the facts, and among them the fact that Stoddard had become the purchaser at the price of $100 for each forty-acre tract.

Flint is chargeable with notice of whatever that deed recites. *Scott* v. *Moore*, 3 Scam. 306.

That forty acres of improved land situate so near to the limits of the city of Galesburg should have been sold for only $100, and that any old resident should permit a cultivated farm of eighty acres, upon which he had resided so long, to be sacrificed for the sum of $200, would be suggestive to any man of ordinary judgment that there was some mistake, or some overreaching in the transaction.

If Flint knew none of these things, it must have been because the conveyance to him was a sham, and he had no real interest in it. But he is chargeable with notice of what is recited in the deed from the trustee to Stoddard.

Old Mr. Lewis was then, and had been for more than thirty years, in the open and visible possession of the land. That possession was notice to all the world that he had some interest in the land; and whoever bought it, while that possession continued, took it subject to that interest, whatever it might be. *Dyer* v. *Martin et al.* 4 Scam. 146; *Brown* v. *Gaffney*, 28 Ill. 150; *Riley* v. *Quigley*, 50 Ill. 304.

The facts of which Flint was chargeable with notice, and the fact of Lewis' possession, were sufficient to put the former upon inquiry, and his failure to make inquiry is equivalent to notice. If he had gone to Lewis, the party in possession, and inquired of him in respect to his interest in the lands, he would have doubtless learned that it was that of one who held the

equity of redemption, which had not been cut off by the pretended and fraudulent sale under the trust deed.

It is objected that the decree contains the finding of a fact not alleged in the bill, viz: that the complainant had supposed, until a certain time, that the instrument he had given was only a mortgage. It is true that there is no such allegation in the bill, and the recital is improperly in the decree; but that recital is not necessary to support the decree, as there are others sufficient for that purpose. In such case we will not reverse, for the introduction of a single isolated recital, not based upon a proper allegation, where there are others sufficient to support the decree. The facts found in the decree for its support are not as strongly stated against the defendant as the evidence warrants; neither will we reverse for that reason.

We are of opinion, upon the whole case, that the decree of the court below should be affirmed.

*Decree affirmed.*